William BARNES, et al.

v.

The AMERICAN TOBACCO COMPANY, INC., et al.

No. CIV. A. 96–5903.

United States District Court, E.D. Pennsylvania.

Oct. 17, 1997.

Stephen A. Sheller, Sheller, Ludwig & Badey, Philadelphia, PA, Thomas E. Mellon Jr., Mellon, Webster & Mellon, Doylestown, PA, Arnold Levin, Jonathan Shub, Levin, Fishbein, Sedran & Berman, Philadelphia, PA, Sherrice A. Knisely, Sheller, Ludwig and Badey, Philadelphia, PA, Julia W. McInerny, Coale and Van Susteren, Washington, DC, Gary Robert Fine, Rodham and Fine, P.A., Fort Lauderdale, FL, Dianne M. Nast, Mary Ann M. Cooke, Roda and Nast, P.C., Lancaster, PA, Clifford E. Douglas, Evanston, IL, for Steven R. Arch, William Barnes, Ciaran McNally, Catherine Potts, Norma Rodweller, Barbara Salzman, Edward J. Slivak, John Teagle.

Edward F. Mannino, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, Peter S. Greenberg, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for American Tobacco Company Inc.

Edward F. Mannino, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for American Brands, Inc.

Hugh R. Whiting, Jones, Day, Reavis & Pogue, Cleveland, OH, Gerhard P. Dietrich, Morton F. Daller, Tracy Canuso Nugent, Daller Greenberg and Dietrich, Fort Washington, PA, for R.J. Reynolds Tobacco Company.

Morton F. Daller, Tracy Canuso Nugent, Daller Greenberg and Dietrich, Fort Washington, PA, for RJR Nabisco, Inc.

Edward F. Mannino, James Lewis Griffith, Virginia Lynn Hogben, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, Peter S. Greenberg, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, Gerhard P. Dietrich, Daller Greenberg & Dietrich, Fort Washington, PA, for Brown & Williamson Tobacco Corporation.

Peter S. Greenberg, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, Virginia Lynn Hogben, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, for Batus Inc., Batus Holdings, Inc.

Judy L. Leone, Dechert, Price & Rhoads, Philadelphia, PA, Thomas Finarelli, Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray, Philadelphia, PA, for B.A.T. Industries P.L.C.,

Judy L. Leone, Robert C. Heim, Christine C. Levin, Ronni Ellen Fuchs, Dechert, Price & Rhoads, Philadelphia, PA, Gerhard P. Dietrich, Daller Greenberg & Dietrich, Fort Washington, PA, for Philip Morris, Inc.

Judy L. Leone, Robert C. Heim, Christine Levin, Dechert, Price & Rhoads, Philadelphia, PA, for Philip Morris Companies, Inc.

Howard M. Klein, William J. O'Brien, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, Edward A. Greenberg, Gerhard P. Dietrich, Daller Greenberg & Dietrich, Fort Washington, PA, for Lorillard Tobacco Company, Inc.

Howard M. Klein, William J. O'Brien, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, Edward A. Greenberg, Daller Greenberg & Dietrich, Fort Washington, PA, for Lorillard, Inc.

William J. O'Brien, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for Loews Corporation.

Judy L. Leone, Dechert, Price & Rhoads, Philadelphia PA, Madeline M. Sherry, Stephen J. Imbriglia, Hecker, Brown, Sherry and Johnson, Philadelphia, PA, for United States Tobacco Company, UST, Inc.

Howard M. Klein, William J. O'Brien, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, for Tobacco Institute, Inc.

Joseph W. Fullem, Jr., Patrick W. Kittredge, Kittredge, Donley, Elson, Fullem & Embick, Philadelphia, PA, Gary M. Marek, Kittredge, Donley, Elson, Fullem, & Embick, Philadelphia, PA, for Council for Tobacco Research–U.S.A., Inc.

Mark E. Squires, J. Kurt Straub, Abrahams, Lowenstein, Bushman & Kauffman, Philadelphia, PA, for Liggett Group, Inc., Liggett & Myers, Inc., Brooke Group, Ltd.

Matthew L. Myers, National Ctr. for Tobacco Free Kids, Washington, DC, for American Heart Association, American Cancer Society, American Lung Association.

### MEMORANDUM

NEWCOMER, District Judge.

Presently before this Court are Defendants' Motion for Summary Judgment Based on the Statute of Limitations, Defendants' Motion for Summary Judgment Concerning Plaintiffs' Contributory Negligence, Assumption of Risk and Consent to Exposure to Hazardous Substances, and Defendants' Motion for Summary Judgment Concerning Plaintiffs' Claims for Medical Monitoring, and plaintiffs' response thereto, and defendants' replies thereto.

### I. Introduction

#### A. Procedural History

Plaintiffs [1] have filed suit against defendants,[2] seeking the establishment of a medical monitoring program. Since the filing of plaintiffs' original Complaint in the Pennsylvania state court system approximately one year ago, this litigation has followed its own unique twists and turns. It has now, however, reached the dispositive motion stage—a stage which has seen defendants file nine joint and/or individual motions for summary judgment. Hence, the instant task before this Court is to dispose of the novel and complex issues raised by these motions. Before addressing these issues, the Court will briefly set forth the procedural and factual history of this case.

On August 27, 1996, this action was removed from state court. Plaintiffs filed a "First Amended Complaint—Class Action" on December 2, 1996. Plaintiffs' First Amended Complaint asserted the following causes of action: (1) medical monitoring; (2) intentional exposure to a hazardous substance; (3) negligence; and (4) strict products liability. Count five of plaintiffs' First Amended Complaint averred that defendants acted in concert or pursuant to a common design.

Plaintiffs sought the following relief in their First Amended Complaint: (1) certify-

---

**1.** The plaintiffs are William Barnes, Ciaran McNally, Catherine Potts, Norma Rodweller, Barbara Salzman and Edwark J. Slivak. Steven Arch was granted leave to withdraw from this action and his claims were dismissed without prejudice.

**2.** The defendants are The American Tobacco Company, Inc., R.J. Reynolds Tobacco Company, RJR Nabisco, Inc., Brown & Williamson Tobacco Corporation, Philip Morris, Inc., Philip Morris Companies, Inc., Lorillard Tobacco Company, Inc., Lorillard, Inc., United States Tobacco Company, The Tobacco Institute, Inc., The Council for Tobacco Research–U.S.A., Inc., Liggett Group, Inc., Liggett & Myers, Inc. and Brooke Group, Ltd. Numerous other defendants have either been dismissed by order of this Court or the parties have stipulated to their voluntary dismissal.

ing this action as a class action; (2) ordering defendants to implement a Court supervised or Court-approved program to medically monitor class members; (3) an award of punitive damages, to be used for common class-wide purposes, including, without limitation, medical research on the diseases that cigarettes cause and the treatment of those diseases, medical research into the addiction, public education campaigns about the health hazards of cigarettes smoking, and programs to assist class members in efforts to quit smoking; (4) awarding such other monetary and injunctive relief as the Court deems just and proper; and (5) awarding the costs of the suit. Plaintiffs requested certification of the following class:

> All current residents of Pennsylvania who are cigarette smokers as of December 1, 1996, and who began smoking before age 19, while they were residents of Pennsylvania.

On June 3, 1997, this Court entered an order and opinion in which plaintiffs' motion for class certification was denied. *Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D.Pa.1997). Plaintiffs' claims were not certifiable under Rule 23(b)(3) because plaintiffs did not satisfy the superiority and predominance requirements. Additionally, plaintiffs' request for certification of their medical monitoring claim was denied because the majority of relief sought by plaintiffs was predominantly compensatory as opposed to equitable. Finally, the Court denied issue certification under Rule 23(c)(4).

Subsequent to the Court's June 3, 1997 Memorandum and Order, plaintiffs filed a motion for leave to file a Second Amended Complaint, along with a renewed motion for class certification. Plaintiffs' Second Amended Complaint, which plaintiffs were granted leave to file and is now the complaint upon which plaintiffs prosecute this action, is different from plaintiffs prior two complaints in this action. In their Second Amended Complaint, plaintiffs assert only one claim against the defendants—a claim for medical monitoring. Plaintiffs have discarded their claims sounding in negligence, strict products liability and intentional exposure to a hazardous substance.[3]

In support of their medical monitoring claim, plaintiffs set forth the following facts in their Second Amended Complaint. Plaintiffs allege that defendants manufacture, promote and sell cigarettes. Defendants' earnings on cigarettes sold throughout the United States allegedly exceeded six billion dollars this past year alone, on gross sales of forty-five billion dollars. According to the Pennsylvania Department of Health, more than 22.6 billion cigarettes were sold in Pennsylvania during the fiscal year July 1995 through June 1996.

Plaintiffs allege that cigarettes contain hazardous substances that cause serious and often fatal diseases of the throat, lungs, and heart, as well as the cardiovascular and pulmonary systems generally, and cause stillbirths and neonatal deaths of babies whose mothers smoke. The hazardous substances include, *inter alia*, nicotine, carbon monoxide, nitrosamine, formaldehyde, formic acid, acetaldehyde, ammonia, benzene, hydrogen cyanide, and "tar," which are all highly dangerous substances.

Plaintiffs maintain that defendants, acting in concert or pursuant to a common design, have engaged in a wide range of conduct for which they should be held liable to plaintiffs. Defendants allegedly have known of the relationship between cigarettes and disease but have concealed their research, publicly denied the relationship between cigarettes and disease, and continue to aggressively promote and sell cigarettes. In so doing, plaintiffs contend that defendants have engaged in this conduct not only with willful, wanton and reckless disregard for the health of those who use their products, "but have intentionally and deliberately consigned millions of users to disease and death, for no reason other than to maximize [their] profits." (Second Amended Compl. ¶ 12). Further, it is alleged that these defendants have known for many years of ways to make safer cigarettes but have intentionally chosen not to do so.

---

**3.** The Court, however, notes that plaintiffs advance these three theories of liability as the underlying theories of liability for their medical monitoring claim.

Defendants have also purportedly known for many years that nicotine is addictive but have publicly denied both the fact that nicotine is addictive and their knowledge of this fact. During the same time that defendants have publicly denied the addictive nature of nicotine, it is alleged that defendants have intentionally controlled the level of nicotine and other toxic substances in the cigarettes in order to preserve the dependence of smokers on cigarettes. Plaintiffs aver that defendants have utilized additives such as ammonia, as well as designs for which defendants have sought patents, to make cigarettes a "package" for the delivery of nicotine. During this same period of time, plaintiffs allege that defendants have also intentionally avoided researching or developing cigarettes that would not cause dependence or addiction in those who use them.

In order to preserve and increase their sales of cigarettes, and despite their knowledge of the diseases and harm that cigarettes cause, it is alleged that defendants have spent millions of dollars each year in advertising and promoting cigarettes and have geared their efforts particularly towards teenagers and children through such efforts as the "Joe Camel" advertising campaign because defendants have allegedly known that unless a person begins smoking before the age of twenty, the person is unlikely to ever begin.

Plaintiffs further allege that in their efforts to conceal the health hazards of smoking and the addictive nature of nicotine, defendants have testified falsely under oath before the United States Congress, provided false explanations to customers and governmental entities about the health hazards of tobacco and the harmful quantities of nicotine, concealed their secret research and testing on the dangers of cigarette smoking, concealed their deliberate manipulation of nicotine levels of cigarettes, required employees, under threat of severe legal sanctions, to keep secret all information that they have learned through their employment about the dangers of cigarette smoking, and concealed documents through devices such as the unwarranted invocation of the attorney client privilege.

In addition, plaintiffs claim that defendants have continued to make false claims to the public, governmental agencies and the United States Congress that they have been making their products as safe as feasible. Plaintiffs assert that these claims are false because defendants allegedly have had the ability, for some time now, to make safer cigarettes by removing hazardous substances from them such as nitrosamine, ammonia, benzene products and others, yet defendants have failed and intentionally refused to remove these hazardous substances.

Based on the conduct of defendants, plaintiffs contend that defendants are liable to them under their medical monitoring claim. Plaintiffs seek the following relief: (1) certifying this action as a class action pursuant to Fed.R.Civ.P. 23(a) and (b)(2); (2) establishing a Court-supervised program, to be funded by defendants, through which the class members would undergo periodical medical examinations in order to promote the early detection of diseases caused by smoking; and (3) awarding the costs of this suit and such other relief as the Court deems just and proper.

By Order dated August 22, 1997, this Court certified the following class pursuant to Rule 23(b)(2):

> All current residents of Pennsylvania who are cigarette smokers as of December 1, 1996, and who began smoking before age 19, while they were residents of Pennsylvania.

The Court found that the requirements of Federal Rule of Civil Procedure 23(a)(1)–(4) had been satisfied and that class certification was proper under Fed.R.Civ.P. 23(b)(2). In reaching this conclusion, it was noted that the record of the action did not demonstrate the existence of individual issues which would preclude certification. In this opinion, this Court explained that it would revisit the issue of class certification, which it recently did.

By Memorandum and Order dated October 17, 1997, this Court decertified this case as a class action pursuant to Fed. R. Civ. P. 23(c)(1). In the memorandum opinion, the Court noted that this case could not proceed

as a class action under Rule 23(b)(2) because too many individual issues were implicated by the facts and circumstances of this case. Thus, pursuant to this Court's discretion under Fed.R.Civ.P. 23(c)(1), the Court vacated its August 22, 1997 Order, which had granted certification in this case.

Consequently, plaintiffs now proceed solely in their individual capacities. As stated above, defendants have filed nine joint and/or separate motions for summary judgment. In this memorandum, the Court will only address defendants' motion for summary judgment based on the statute of limitations, defendants' motion for summary judgment concerning plaintiffs' contributory negligence, assumption of risk and consent to exposure to hazardous substances, and defendants' motion for summary judgment concerning plaintiffs' claims for medical monitoring. Before turning to the substance of defendants' motions, the Court will briefly describe plaintiffs' proposed medical monitoring program and will set forth the plaintiffs' medical histories and conditions.

### B. Plaintiffs' Proposed Medical Monitoring Program

At the outset, it is noted that the parties contest whether the plaintiffs actually advance one or two medical monitoring programs. From defendants' perspective, plaintiffs advance two separate and distinct programs that vary significantly. One program is advanced by Drs. Petty and Hyers; the other program is advanced by Dr. Burns. Defendants state that Dr. Hyers, one of plaintiffs' experts, expressly acknowledged that there exists a lack of consensus among plaintiffs' experts as to who should be screened, what tests should be administered, and when the tests should be administered. Dr. Hyers stated that he expects that the plaintiffs' experts will at some point reach a "compromise." (Defs.' Ex. 2). In contrast to defendants' position, plaintiffs represent that they propose only one medical monitoring program.

While it appears from the record that plaintiffs' experts have advanced two medical monitoring programs throughout the course of this litigation, the plaintiffs presently represent that they advance only one program— the program advanced by Dr. Burns. Because plaintiffs represent that they are advancing the program suggested by Dr. Burns, the Court will base its consideration of defendants' summary judgment motions on the "Burns Program."

In this regard, the Court notes that the Burns Program is designed to monitor and detect three diseases which are allegedly caused by smoking: cardiovascular disease, lung cancer and chronic obstructive pulmonary disease ("COPD"). Further, seven diagnostic tests and procedures will constitute the components of the medical monitoring program: (1) electrocardiogram ("EKG"); (2) cardiovascular risk factor assessment; (3) chest x-ray screening; (4) exercise stress test; (5) physical examination, including blood pressure, blood lipid and total cholesterol; (6) pulmonary function test, including spirometry;[4] and (7) sputum cytology.[5] (Pls.' Ex. 72). However, in order to fully put defendants' arguments in context, the Court will describe in greater detail the two programs which were advanced by plaintiffs.

#### 1. The Petty–Hyers Program

Drs. Petty and Hyers have jointly proposed a medical monitoring program. Participants in the medical monitoring program would be limited to current smokers and "recent quitters" with 20 pack-year smoking histories.[6] (Defs.' Ex. 10 at 6, Report of Thomas L. Petty, M.D., and Thomas M. Hyers, M.D. ("Petty–Hyers Report")). Under this entry level requirement, it appears that at least one of the plaintiffs, Ciaran

---

**4.** Spirometry measures the amount of air which can be inhaled and then exhaled rapidly. Full pulmonary function measures, among other things, lung volume and efficiency of gas exchange. (Defs.' Ex. 2 at 99–100).

**5.** Sputum cytology is the examination of cells of expectorated matter.

**6.** "Pack-year" refers to the number of years during which an individual has smoked a pack of cigarettes per day. For example, a person who smokes one pack a day for 10 years has a 10 pack-year history. A person smoking half a pack per day for 10 years has a five pack-year history.

McNally, would not be eligible for medical monitoring.[7]

The entry point for the Petty–Hyers program is annual spirometric testing of 20 pack-year smokers for detection of COPD. (Petty Dep. Defs.' Ex. 4 at 59–63; Hyers Dep. Defs.' Ex. 2 at 224–25). Only after a finding of abnormality through spirometry would further testing by chest x-ray and sputum cytology be performed. *Id.* EKGs, exercise stress tests and pulmonary function testing other than spirometry are excluded from their monitoring regime. (Petty Dep. Defs.' Ex. 4 at 129–30; Hyers Dep. Defs.' Ex. 4 at 99–104). The purpose of detecting COPD would not be to treat the condition. Both Drs. Petty and Hyers acknowledge that there is no evidence that lung function improves through medical treatment. (Petty Dep. Defs.' Ex. 4 at 156–58; Hyers Dep. Defs.' Ex. 2 at 207–08). Rather, they urge screening of smokers because they believe the presence of COPD may be a surrogate marker for risk of lung cancer. (Defs.' Ex. 10 at 4–7). In advancing their program, Drs. Petty and Hyers agree with the accepted medical principle that screening of smokers should not be prescribed unless it would "substantially decrease the premature morbidity and mortality from smoking related diseases." *Id.* at 8.

Drs. Petty and Hyers both have conceded that there are no clinical studies that support their belief that their program would prove efficacious under these principles. (Petty Dep. Defs.' Ex. 4 at 102–04; Hyers Dep. Defs.' Ex. 2 at 138). For example, both Drs. Hyers and Petty agree that there is no study establishing that a diagnosis of abnormal pulmonary function leads to a greater proportion of smokers ceasing smoking. (Defs.' Ex. 4 at 123; Defs.' Ex. 2 at 209). Drs. Petty and Hyers also agree that lung cancer screening using chest x-ray or sputum cytology has not been demonstrated to be efficacious, and that studies to date have uniformly reached the opposite conclusion. (Defs.' Ex. 4 at 64–65; Defs.' Ex. 2 at 139–40, 143–48).

In sum, Dr. Petty has admitted that his proposed program is "not today accepted" in the medical community. (Defs.' Ex. 4 at 78–79, 153–54), and both experts have acknowledged that central aspects of the program would be experimental in nature. For example, as to the use of sputum cytology, the Petty–Hyers Report itself points out that the test "is expensive, laborious and difficult to standardize" and that its "role . . . is still under intense study and is being constantly refined." (Defs.' Ex. 10 at 5). In addition, Dr. Petty has written that "it is not likely that sputum cytology based solely on human diagnosis will ever become practical on a widespread basis." (Defs.' Ex. 21 Thomas L. Petty, "Lung Cancer Screening", *in Comprehensive Therapy*, 1995 21(8) 432–437, 434). Similarly, as to the use of spirometry, Dr. Petty recently wrote that "an intensive effort in COPD is needed because despite several decades of COPD research, virtually all of the fundamental issues about COPD remain. . . ." (Defs.' Ex. 22 Thomas L. Petty, "Building a National Strategy for the Prevention and Management of Research in Chronic Obstructive Pulmonary Disease", *in JAMA* 227(3), 246–53, 251 (January 15, 1997)).

### 2. The Burns Program

In the Burns Program, Dr. Burns classified smokers by "pack-year" and age criteria to determine participation in various forms of screening. Under the new proposal, the eligibility of smokers for monitoring would be determined in the following manner:

1. Persons age 25 and older and who have smoked an average of 10–15 or more cigarettes per day for 10 years would receive an EKG, cardiovascular risk factor assessment, and a physical examination;

2. Persons age 40 and older who have smoked an average of 15 or more cigarettes per day for 20 years would receive an EKG, cardiovascular risk factor assessment, physical examination, and exercise stress test;

Ex. 2 at 118–19, 244).

---

7. Plaintiff McNally has smoked less than a pack per day for slightly over 10 years. (Hyers Dep.

3. Persons age 45 and older and who smoked an average of 15 or more cigarettes per day for 20 years would receive an EKG, cardiovascular risk factor assessment, physical examination, an exercise stress test, and a pulmonary function test; and

4. Persons age 50 and older and who smoked an average of 15 or more cigarettes per day for 20 years would receive an EKG, cardiovascular risk factor assessment, physical examination, an exercise stress test, a pulmonary function test, a chest x-ray, and sputum cytology.

(Defs.' Ex. 3. ¶¶ 3, 4, 6).

Following this initial testing, a physical examination and EKG would be repeated annually, as would any other test showing a "significant abnormality". (Defs.' Ex. 3 ¶¶ 5, 6). All remaining tests would be repeated every two to three years. *Id.*

As Dr. Hyers has noted, there are major differences between the Burns Program and the Hyers–Petty Program, including:

1. Dr. Burns would screen for more smokers than would Drs. Petty and Hyers; smokers with as few as five-pack years could receive medical monitoring. (Defs.' Ex. 3 ¶ 4). Dr. Hyers, on the other hand, stated that 20 pack-years is the starting point where there is a significant enough risk to commence monitoring. (Defs.' Ex. 2 at 20–21).

2. Dr. Burns would routinely screen some or all monitoring participants using EKGs, exercise stress testing, and pulmonary functions testing other than spirometry (Defs.' Ex. 3 ¶¶ 3, 4, 6). None of these tests are recommended by Drs. Hyers and Petty. (Defs.' Ex. 4 at 129–30; Defs.' Ex. 2 at 99–104).

3. Dr. Burns would routinely screen some participants using chest x-ray and sputum cytology, (Defs.' Ex. 3, ¶¶ 3, 4), while Drs. Petty and Hyers would use these tests only on persons with abnormalities detected using spirometry. (Defs.' Ex. 4 at 59–63; Defs.' Ex. 2 at 224–25).

Unlike Drs. Hyers and Petty, Dr. Burns did not support his proposal by arguing for reconsideration of the accepted view that screening of asymptomatic smokers is not efficacious. Rather, he has defended deviating from standard medical practice principally by pointing to a possible increase in smoking cessation. He explained that early detection of a smoking-related disease may, by allowing a person to know his or her current health status, provide "substantial increased motivational force" to stop smoking. (Defs.' Ex. 9 at 82–83, 88–90).

Dr. Burns has argued that this opportunity to stop smoking constituted the "alteration benefit" of his program. *Id.* He, like plaintiffs' other experts, was unable to cite specific literature supporting his views. When pressed to cite support for his views, he replied that his various opinions were based on a "vast body" of literature, but was unable to identify specific support because he does not "store information that way." *Id.* at 66–72, 187.

Dr. Burns has stated that he could not testify that his program would work. He could testify only that "the program that I have suggested here might work. . . . I'm simply making a recommendation about one method by which the court might decide to resolve this issue." *Id.* at 29.

*C. The Plaintiffs' Individual Circumstances*

The Court will briefly summarize the medical history of plaintiffs. Before doing so, the Court notes that none of plaintiffs' medical monitoring experts has examined the plaintiffs or reviewed their medical records. (Defs.' Ex. 4 at 36–40; Ex. 2 at 55–56). Plaintiffs' experts acknowledge that they lack information as to whether individual plaintiffs have already received screening, have already been diagnosed with the subject diseases, or possess risk factors other than smoking for the diseases as to which monitoring is proposed. Despite this lack of knowledge, Dr. Burns asserts that he is capable of opining that specific plaintiffs should receive certain specific forms of screening. (Defs.' Ex. 3 ¶¶ 6, 7). Dr. Petty, on the other hand, admitted that he lacks an adequate

basis to assess whether any individual plaintiff needs any particular kind of medical monitoring at the present time. (Defs.' Ex. 4 at 36–42).

The record in this case includes a wealth of information regarding the medical histories, smoking cessation efforts, and past medical monitoring of each plaintiff. For instance Norma Rodweller has high cholesterol and a family history of heart disease. She has been diagnosed with vocal chord polyps and COPD, and has shown abnormalities in pulmonary function tests. She has also been tested for potential coronary insufficiency. She nevertheless continues to smoke despite having been told by doctors that smoking aggravates her medical illnesses. She has also refused her doctor's directions to obtain necessary medical screening such as pap smears and mammograms.

Ciaran McNally is 26 years old. She has been a regular smoker since she was 15 years old and smokes 10–15 cigarettes per day. She received chest x-rays when appropriate in response to symptoms. She has not followed her doctors' advice to quit smoking while taking oral contraceptives.

William Barnes is mildly obese with hypertension and elevated cholesterol. He has a history of coronary artery disease, and he has been diagnosed with hypertensive athersclerotic heart diseases. He is also a heavy drinker. He has received EKGs, chest x-rays and pulmonary function testing as appropriate in response to symptoms. He has been told to quit smoking every time he visited his doctor, and continues to smoke despite evidence of fibrosis of his lung.

Catherine Potts has been diagnosed with COPD, coronary artery disease, angina, and hyperlipidemia and hypertension. She continues to smoke despite being advised by her doctors to cease due to cardiac problems and a potential vocal chord malignancy. She has not followed her doctor's directions for testing, including a recommended colonoscopy following rectal bleeding. On one occasion, she insisted on being discharged from the hospital against medical advice after being diagnosed with possible myocardial infraction. She continues to drink caffeinated beverages despite begin advised by her doctors to cease doing so.

Edward Slivak has continued smoking despite abnormal pulmonary function tests and abnormal chest x-rays leading to a diagnosis of COPD. He has high blood pressure and elevated cholesterol, has received EKGs and has been diagnosed with myocardial infarction. Although he has been advised repeatedly not to smoke due to his various medical conditions, he is still smoking.

Barbara Salzman continues to smoke despite having been diagnosed with emphysema and mild to moderate COPD based on pulmonary function tests and chest x-rays. She has received chest x-rays, MRI scans and EKGs in response to her symptoms. She has not, however, mentioned her emphysema to her family physician, explaining that she does not desire to follow-up because "I don't like to look for trouble." She drinks an excessive amount of caffeine and has a family history of heart disease.

The Court will now address the issues raised by defendants' summary judgment motions. The plaintiffs have filed responses to which the defendants have filed replies.

## II. Summary Judgment Standard

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir.1988). "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The evidence presented must be viewed in the light most favorable to the nonmoving party. *Id.* at 59.

The moving party has the initial burden of identifying evidence which it believes shows an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Childers v. Joseph*, 842 F.2d 689, 694 (3d Cir.1988). The moving party's burden

may be discharged by demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Moreover, when the non-moving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.,* 812 F.2d 141, 144 (3d Cir.1987) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *White,* 862 F.2d at 59 (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). The non-movant must specifically identify evidence of record, as opposed to general averments, which supports his claim and upon which a reasonable jury could base a verdict in his favor. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The non-movant cannot avoid summary judgment by substituting "conclusory allegations of the complaint ... with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). Rather, the motion must be denied only when "facts specifically averred by [the non-movant] contradict facts specifically averred by the movant." *Id.*

### III. Statute of Limitations

Defendants move for summary judgment based on the statute of limitations. Defendants contend that Pennsylvania's two year statute of limitations applies to the instant case because plaintiffs' underlying legal theory is one of negligence. 42 Pa. Cons.Stat. Ann. § 5524. Applying this statute of limitations, defendants submit that all of the plaintiffs are barred from prosecuting their claims because they either knew, or should have known, that smoking placed them at an increased risk of contracting a serious latent disease years before any of them commenced this litigation. Defendants additionally argue that they should not be estopped from asserting the statute of limitations defense, that the doctrine of laches does not apply to this case, and that the continuing tort doctrine does not apply to this case.

In response, plaintiffs ask this Court to deny defendants' motion for the following reasons. First, plaintiffs argue that the equitable doctrine of laches controls, thus making the only relevant considerations whether defendants can show prejudice from the timing of plaintiffs' suit or whether plaintiffs unjustifiably delayed in bringing their medical monitoring claim. Second, due to defendants' ongoing wrongful conduct, the continuing wrong doctrine applies and prevents any applicable statute of limitations from beginning to run until the conduct ceases. Third, due to the nature of the injury of medical monitoring case—long-term exposure increasing the risk of latent disease—there could have been no earlier accrual of plaintiffs' claims. Fourth, because medical monitoring is a relatively new cause of action, plaintiffs could have not brought this action until recently.

■ As a threshold matter, the Court finds that a statute of limitations applies to this case, not the doctrine of laches. To begin, this action is not purely an equitable action. Admittedly, the Court has recently concluded that this action is both inherently equitable and legal. *See Barnes v. American Tobacco Co.,* Civil Action No. 96–5903, slip op. at 14, —— F.Supp. ——, —— [1997 WL 810426] (E.D.Pa. Oct. 10, 1997). Hence, plaintiffs' argument that this action is purely equitable has already been rejected. More importantly, however, a statute of limitations should apply to this action because plaintiffs could have brought this action at law or in equity.

■ It has been long established that equity will follow the law and will apply the statute of limitations for the corresponding legal action. *Ebbert v. Plymouth Oil Co.,* 348 Pa. 129, 34 A.2d 493, 495 (1943). In particular, where a plaintiff could maintain an action at law but fails to do so within the

required time period, he will not be heard to bring the same action in equity. *Id.* at 495–96; *City of Philadelphia v. Louis Labs., Inc.,* 201 Pa.Super. 16, 189 A.2d 891, 893 (1963). In *Ebbert,* the Supreme Court of Pennsylvania stated:

> [I]t is well established that equity will frequently follow the statute of limitations which controls analogous proceedings at law. This is especially, if not invariably, true if the cause of action is *not exclusively cognizable in equity,* which is the situation here, because, where an accounting is desired, it may be obtained in a common-law proceeding. . . . Because of this concurrent jurisdiction the statute of limitations is generally held to be a bar to proceedings in equity for an accounting when it would be a bar to an action at common law for the same matter.

*Ebbert,* 34 A.2d at 495–96 (emphasis added). Thus, if a plaintiff is barred by the statute of limitations from bringing an action at law, this same plaintiff will be barred from bringing the concurrent action in a court of equity.

Fortuitously, the Third Circuit, in *Algrant v. Evergreen Valley Nurseries Ltd.,* 126 F.3d 178 (3d Cir.1997), recently addressed a very similar issue. In *Algrant,* a question arose as to whether the statute of limitations that attaches to underlying substantive claims in a declaratory judgment action also applies to the actual declaratory judgment counts that were based on the underlying substantive claims. In answering this question in the affirmative, the Third Circuit explicitly noted that "[i]t is settled . . . that where legal and equitable claims coexist, equitable remedies will be withheld if an applicable statute of

limitations bars the concurrent legal remedy." *Id.* at 181 (citation omitted). The Third Circuit also approvingly cited the Supreme Court's holding that "equity will withhold its relief in such a case where the applicable statute of limitations would bar the concurrent legal remedy."

Based on this persuasive reasoning, the Court concludes that once the statute of limitations has run on an action at law, a plaintiff cannot save his claim by bringing the concurrent claim in equity. For the purposes of this case, there exist two pertinent inquiries: first, does plaintiffs' current equitable action have a concurrent legal action; and second, if yes, what statute of limitations applies? The first line of inquiry has already been answered; there is no doubt that this action has a purely legal concurrent action. As stated in this Court's Memorandum and Order dated October 12, 1997, plaintiffs could have brought an entirely legal action by simply requesting lump-sum money damages. *Barnes,* slip op. at 11–12, —— F.Supp. at ——–——. Consequently, because plaintiffs could have brought this action at law, the next line of inquiry is what statute of limitations would be applied in that legal action.[8]

■ In order to determine what statute of limitations should apply in this action, the Court must look at the theories of liability that underlie a medical monitoring claim. Under *Redland Soccer Club, Inc. v. Dep't of the Army,* the Supreme Court of Pennsylvania stated that a plaintiff, in part, must prove that he was exposed to a proven hazardous substance caused by the defendant's *negligence.* 696 A.2d 137, 145 (Pa.1997).[9] The

8. The Court also rejects plaintiffs' argument that Pennsylvania law would not apply any statute of limitations to a medical monitoring claim. Plaintiffs cite *Simmons v. Pacor,* 543 Pa. 664, 674 A.2d 232 (1996) to support this position. *Simmons,* however, does not address this issue at all. *Simmons* merely stated that, under certain circumstances, "recovery for medical monitoring is appropriate and just. . . ." This language simply does not address plaintiffs' extraordinary argument that no statute of limitations applies to a medical monitoring claim unlike every other cause of action under Pennsylvania law.

9. In *Redland Soccer,* the Pennsylvania Supreme Court set forth the elements that a plaintiff need

prove in order to prevail on a common law claim for medical monitoring:

(1) exposure greater than normal background levels;
(2) to a proven hazardous substance;
(3) *caused by the defendant's negligence;*
(4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease;
(5) a monitoring procedure exists that makes the early detection of the disease possible;
(6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

*Redland Soccer* court thus found that a plaintiff must establish that the defendant was negligent in order to set forth a medical monitoring claim. Because negligence is the theory of liability that underlies a medical monitoring claim, this Court predicts that the Pennsylvania Supreme Court, if confronted with this issue, would apply the two year statute of limitations set forth in 42 Pa. Cons. Stat. Ann. § 5524. Moreover, to the extent that strict products liability or an intentional tort can act as the underlying theory of liability for a medical monitoring claim, which the parties dispute, the applicable statute of limitations would still be two years because intentional torts and strict products liability are governed by 42 Pa. Cons.Stat. Ann. § 5524. Having determined what statute of limitations applies to this action, the Court will now ascertain whether plaintiffs would have been barred from maintaining a legal action because of the operation of the statute of limitations.

Generally, a plaintiff "is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." *Pocono International Raceway, Inc. v. Pocono Produce,* 503 Pa. 80, 468 A.2d 468, 471 (1983). A claim under Pennsylvania law accrues at "the occurrence of the final significant event necessary to make the claim suable." *Mack Trucks, Inc. v. Bendix–Westinghouse Automotive Air Brake Co.,* 372 F.2d 18, 20 (3d Cir.1966). The "statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake, or misunderstanding do not toll the running of the statute of limitations." *Pocono,* 468 A.2d at 471. However, there are some exceptions to this narrow rule.

The "discovery rule" is a "narrow exception to this general rule." *Tohan v. Owens–Corning Fiberglas Corp.,* 696 A.2d 1195, 1200 n. 4 (Pa.Super.1997). The discovery rule tolls the statute of limitations to reflect the "plaintiff's complete inability, due

to facts and circumstances not within his control, to discover an injury despite the exercise of due diligence." *Kingston Coal Co. v. Felton Mining Co., Inc.,* 456 Pa.Super. 270, 690 A.2d 284, 288 (Super.1997). Under the discovery rule, the statute of limitations begins to run when the "plaintiff knows, or in the exercise of reasonable diligence should have known, (1) that he has been injured, and (2) that his injury has been caused by another's conduct." *Bradley v. Ragheb,* 429 Pa.Super. 616, 633 A.2d 192, 194 (Super.1993).

The plaintiff has the burden of proving that he exercised reasonable diligence in bringing his claim. *Cochran v. GAF Corp.,* 542 Pa. 210, 666 A.2d 245, 249–50 (1995). Reasonable diligence is "an objective, rather than a subjective standard. Under this standard, the plaintiff's actions must be evaluated to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Id.* at 249. Reasonable diligence "may require one to seek further medical examinations as well as competent legal representation." *Id.* In addition, "when information is available, the failure of a plaintiff to make proper inquiries is a failure to exercise reasonable diligence as a matter of law." *Kingston Coal,* 690 A.2d at 289.

In contrast, plaintiffs contend that the continuing tort doctrine applies to this case. Plaintiffs cite to the following passage in *Page v. United States,* 729 F.2d 818, 821–22 (D.C.Cir.1984), for the proposition that they may avail themselves to the doctrine of continuing harm in lieu of the discovery rule:

> It is well-settled that when a tort involves continuing injury, the cause of action accrues, and the limitations period begins to run, at the time the tortious conduct ceases. Since usually no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm, it seems proper

(7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

The Court explained that "[p]roof of these elements will naturally require expert testimony." *Id.* at 146–47.

to regard the cumulative effect of the conduct as actionable. Moreover, since one should not be allowed to acquire a right to continue the tortious conduct, it follows logically that statutes of limitation should not run prior to its cessation. . . .

Relying on this case, and others, plaintiffs argue that their medical monitoring claims are not barred by the statute of limitations because the continuing harm doctrine applies. Specifically, plaintiffs argue that "defendants' defective design, manufacturing, and sale of cigarettes that are intended to be as addictive as possible, suppression of research regarding the harmfulness of smoking and other conduct *constitute a continuing harm* that has, and continues to be, inflicted on plaintiffs and the entire class." (Pls.' Br. at 100) (emphasis added).

 Notwithstanding plaintiffs' argument, the Court finds that the continuing harm doctrine simply does not apply to the facts of this case. It is axiomatic that the statute of limitations applies in cases involving product defects and begins to run when the plaintiff knows, or should have known, of his injury and that it has been caused by another. *Bradley,* 633 A.2d at 194; *Cochran,* 666 A.2d at 249. Moreover, in "a latent disease case [or "creeping disease" case], . . . where the claim is not discoverable despite the exercise of due diligence, the limitations period is tolled under the 'discovery rule.' " *Gunsalus v. Celotex Corp.,* 674 F.Supp. 1149, 1153 (E.D.Pa.1987) (citation omitted). In cases involving exposure to a hazardous substance, Pennsylvania courts specifically have rejected the continuing tort theory. As the Pennsylvania Superior Court has written:

In *Anthony v. Koppers Co.,* 284 Pa.Super. 81, 425 A.2d 428 (1980), *revers'd on other grounds,* 496 Pa. 119, 436 A.2d 181 (1981), we reviewed the application of the statute of limitations to cases in which the plaintiff has contracted a disease from a continuous exposure to a hazardous substance. We found that other jurisdictions have taken one of three approaches to these "creeping disease" cases:

A few jurisdictions have held that in a creeping disease case the statute starts to run with the plaintiff's "first breath"

if the hazardous substance, even though he does not discover his disease or its cause until many years later. The first breath rule, however, has led to such harsh results that it has been widely repudiated. Other jurisdictions have viewed subjecting the plaintiff to exposure as a continuing tort and have adopted what may be called "last breath" rule, under which the statute of limitations starts to run at the last exposure, *but neither has this rule proved satisfactory. Garrett v. Raytheon Co.,* 368 So.2d 516 (Ala.1979) (statute of limitations barred suit for injuries from exposure to radiation where the last exposure occurred in 1957, even though symptoms were not manifest until 1975). Accordingly, a majority of the jurisdictions that have considered this issue, including the Supreme Court of the United States, have held that the discovery rule applies to creeping disease cases. *See Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

\* \* \*

We further noted, that while our Supreme Court had indicated that it might apply a "last breath" analysis, *see Plazak v. Allegheny Steel Co.,* 324 Pa. 422, 188 A. 130 (1936), it had in fact subsequently applied the discovery rule. *See Ciabattoni v. Birdsboro Steel Foundry & Machine Co.,* 386 Pa. 179, 125 A.2d 365 (1956).

*Staiano v. Johns Manville Corp.,* 304 Pa.Super. 280, 450 A.2d 681, 683–84 (1982) (emphasis added) (citations omitted). Consequently, it is obvious to this Court that the Pennsylvania state courts apply the discovery rule in "creeping disease" cases, not the continuing tort doctrine.

The Third Circuit agrees. In *Kichline v. Consolidated Rail Corp.,* 800 F.2d 356 (3d Cir.1986), the Court of Appeals explained:

[C]ontinuing conduct of defendant will not stop the ticking of the limitations clock begun when plaintiff obtained requisite information. On discovering an injury and its cause, a claimant must choose to sue or foregone that remedy. . . . Once discovery

occurs, ... it becomes necessary to consider the other side of the coin—the policy against the presentation of stale claims. *Id.* at 360. *See also Allgood v. R.J. Reynolds Tobacco Co.*, 80 F.3d 168, 170 (5th Cir.) (where "the causal relationship between smoking and [plaintiff's] injuries was known to [plaintiff] at least as early as February 1986 ... the theory of continuing tort is immaterial ... because the statute of limitations began to run in February of 1986").

■ Under plaintiffs' theory, the statute of limitations would not begin to run until the plaintiffs were no longer "exposed" to the alleged hazardous substances in defendants' cigarettes, without regard to whether or not they knew of their injury and its cause. This approach is contrary to Pennsylvania law and its application here would "hinder and frustrate the ultimate aim of limitations periods." *Casner v. American Federation of State, County & Municipal Employees*, 658 A.2d 865 (Pa.Cmwlth.1995). Pennsylvania courts simply do not apply the continuing tort doctrine to cases involving defective products or latent diseases. Significantly, plaintiffs do not dispute that the discovery rule applies to products liability cases, and they do not cite any Pennsylvania product liability cases that actually apply the continuing tort theory to toll the running of the statute of limitations. Further, plaintiffs do not in any manner attempt to address the *Staiano* case, wherein the Pennsylvania Superior Court held that the discovery rule, not the continuing tort doctrine, applies to a "creeping disease case" based upon asbestos exposure. Finally, the cases cited by plaintiffs, which do not involve work place discrimination, simply do not support their position.[10] Because plaintiffs have been unable to demonstrate that the continuing tort doctrine should be applied to the facts of this case, the Court will only apply the discovery rule, if it is applicable.

■ A claim under Pennsylvania law accrues at "the occurrence of the final significant event necessary to make the claim suable." *Mack Trucks*, 372 F.2d at 20. Hence, the first step in this Court's analysis is to determine when the final event, necessary to make plaintiff's medical monitoring claim suable, occurred. Examining the elements of a medical monitoring claim, the Court finds that each plaintiffs' cause of action for medical monitoring accrued when the plaintiff was placed at a "significantly increased risk of contracting a serious latent disease."[11] *Redland*, 696 A.2d at 145.

It is at this point in time—when a person, because of another's negligence in exposing him or her to a hazardous substance beyond normal background levels, is placed at a significantly increased risk of contracting a serious latent disease—that a person can maintain a medical monitoring claim. After a person has been exposed to a hazard substance beyond normal background levels due to another's negligence, and has been placed at a significantly increased risk of contracting a serious latent disease as a proximate result of the exposure, this person can successfully maintain a medical monitoring claim as long as this person can satisfy the remain-

---

**10.** *See* (Defs.' Reply Br. Statute Limitations at 10–12).

**11.** In adopting this event as the "last event" that makes plaintiffs' claim suable, the Court perforce rejects plaintiffs' argument that a medical monitoring claim is not about "increased risk" but rather "long-term exposure." (Pls.' Br. at 102–04). It is not "the fact of long-term exposure" which creates the need and justification for medical monitoring; rather, it is the "increased risk of contracting a serious latent disease" which creates the need for medical monitoring. For example, long-term exposure to a substance that *does not cause an increased risk of disease* would not entitle a plaintiff to recover medical monitoring. Conversely, short-term exposure to a hazardous substance that does cause an increased risk of contracting a serious latent disease would entitle a plaintiff to recover medical monitoring. For example, if a nuclear power plant negligently released hazardous substances over a wide geographical area over a short period of time, and the people within this geographical area were placed at a significantly increased risk of contracting a serious latent disease as a proximate result of this exposure, all of these individuals would be entitled to bring a medical monitoring claim. Thus, a medical monitoring claim need not be about "long-term exposure," rather the central consideration in determining a plaintiff's entitlement to maintain such a claim is whether this person has been placed at a significantly increased risk of contracting a serious latent disease.

ing elements articulated in *Redland*, that is, proving "a monitoring procedure exists that makes the early detection of the disease possible; the prescribed regime is different from that normally recommended in the absence of the exposure; and the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles." *Id.* at 147. Having determined when the last event needs to occur to make a medical monitoring claim suable, the Court will now determine when the "last event" occurred for each plaintiff that made their medical monitoring claim suable.

In order to determine when the "last event" occurred for each plaintiff, the Court must perforce determine when their exposure to smoking placed them at "a significantly increased risk of contracting a serious latent disease." To simply this inquiry, and to err in favor of plaintiffs, this Court will use plaintiffs' experts' own proposed testimony as to when each and every named representative became eligible to participate in the medical monitoring program. In this regard,

plaintiffs' experts have proposed certain dates at which plaintiffs would be entitled to participate in the proposed medical monitoring program. According to plaintiffs' expert Dr. Burns, a person who has smoked 15–20 cigarettes a day for 10 years would be entitled to receive three of the seven proposed tests, *i.e.*, it is only after a person has smoked 10–15 cigarettes per day for 10 years that this person has been placed at a "significantly increased risk of contracting a serious latent disease," which would entitle this person to participate, albeit not fully, in plaintiffs' proposed program.[12] Under the Petty–Hyers Program, a person would be entitled to medical monitoring if he or she has a twenty pack-year history, thus, it is at the twenty pack-year level that a person, under the Petty–Hyers Program, is placed at a "significantly increased risk of contracting a serious disease." To err in favor of the plaintiffs, this Court will only apply the "twenty pack-year" level in determining when the plaintiffs' medical monitoring claims accrued.[13]

**12.** Under this scenario, a five-year pack smoker (a person who has smoked 10 cigarettes per day for 10 years) would qualify for medical monitoring because according to plaintiffs' experts this person has been placed at a significantly increased risk of contracting a serious latent disease.

**13.** In applying this twenty pack-year level, the Court perforce rejects plaintiffs' argument that each named plaintiff's claim accrued only after they met the certain requirements of each sub-level of Dr. Burns' program. In their brief, plaintiffs argue that their claims could not have accrued—in other words, they were not placed at an increased risk of contracting a serious latent disease—until each plaintiff had met the requirements of the sub-level medical monitoring group for which they are currently able to participate. For example, plaintiffs argue that Mr. Barnes was not able to receive the full complement of medical monitoring tests (all seven diagnostic tests) until he had smoked one pack per day for twenty years and reached the age of 50; under plaintiffs' reasoning, Mr. Barnes' right to participate in the full range of medical monitoring did not arise until last year, when he reached the age of 50. Based on this reasoning, plaintiffs contend that Mr. Barnes' claim cannot be time-barred because his claim did not accrue until last year. However, the following illustration will expose the specious nature of plaintiffs' argument. Under plaintiffs' proposed program, a person can participate in the first sub-level of his medical monitoring program when he or she

reaches the age of 25 and has smoked 10–15 cigarettes for 10 years. In Mr. Barnes' situation, he would have been eligible to participate in the first sub-level of plaintiffs' proposed medical monitoring group in 1979 because he was over 25 years of age and had been smoking 15–20 cigarettes a day since 1969. By plaintiffs' experts' own testimony, as of 1979, Mr. Barnes had been placed at a "significantly increased risk of contracting a serious latent disease" due to his exposure to cigarette smoking, *i.e.*, Mr. Barnes had been injured. Thus, if Mr. Barnes was aware of this injury and its cause in 1979, he would have had only two years from the date of injury to bring his claim for medical monitoring. Under plaintiffs' reasoning, if Mr. Barnes failed to bring his claim for medical monitoring before the end of 1981, Mr. Barnes could bring a medical monitoring claim after he reached the next sub-level of plaintiffs' proposed medical monitoring claim. For example, a person, under plaintiffs' program, is entitled to receive four diagnostic tests after they reach the age of 40 and have smoked 15 or more cigarettes for 20 years. Applied to Mr. Barnes' circumstances, Mr. Barnes would have been eligible for sub-level two in 1987 because he was forty years of age and had smoked the requisite number of cigarettes for 20 years. It appears that plaintiffs are arguing that a person receives a new "injury" each time they qualify for different diagnostic testing, and as such, their claim does not accrue for each sub-level until they reach the requirements for that sub-level.

■ Applying the twenty pack-year level, the Court concludes that five of the six plaintiffs were placed at a "significantly increased risk of contracting a serious latent disease," and thus the last event occurred which would make their medical monitoring claims suable, many years ago. Ms. Rodweller has been smoking approximately one to one-a-half packs of cigarettes per day for about forty-two years. (Rodweller Dep. at 8, 15). At a minimum, Ms. Rodweller became a twenty pack-year smoker in 1970; it was during this year in which she was placed at a "significantly increased risk of contracting a serious latent disease." Therefore, Ms. Rodweller had approximately until the end of 1972 to bring her medical monitoring claim; she did not. Thus, unless Ms. Rodweller can demonstrate that her claim is saved by the discovery rule, her claim would be time-barred. A review of the smoking history of four of the other five plaintiffs demonstrates that they are in similar position as Ms. Rodweller.[14]

Ms. Salzman has been smoking at least one to one-a-half packs of cigarettes per day for about forty-one years. (Salzman Dep. at 16, 54, 56). At a minimum, Ms. Salzman became a twenty pack-year smoker in 1976. Mr. Slivak has been smoking at least one to two packs per day since he was approximately 15 years old—39 years ago. At a minimum, Mr. Slivak became a twenty pack-year smoker in 1978. (Slivak Dep. at 9–11). Mr.

Barnes has been smoking a pack of cigarettes per day since approximately 1970. (Barnes Dep. at 111, 124). Thus, Mr. Barnes became a twenty-pack year smoker in 1990. Finally, Ms. Potts has been smoking at least one pack of cigarettes a day for the last 44 years. (Potts Dep. at 33). At a minimum, Potts became a twenty-pack year smoker in 1973.

Based on these facts, and without applying the discovery rule, the medical monitoring claims of these five plaintiffs are barred by the two year statute of limitations. For example, Ms. Rodweller had approximately two years from the end of 1970 to bring her medical monitoring claim. Ms. Salzman had until the end of 1978 to bring her claim. Mr. Slivak had until the end of 1980. Ms. Potts should have filed her claim by no later than the end of 1975, and Mr. Barnes, who came nearest to satisfying the statute of limitations, should have filed his claim by the end of 1992. Under a pure statute of limitations analysis, these five plaintiffs' claims are barred by the statute of limitations because they waited until 1996 to file their claims for medical monitoring.[15] Even if this Court applied the discovery rule, the claims of these five plaintiffs would be barred.

The discovery rule tolls the statute of limitations to reflect the "plaintiff's complete ina-

---

The Court, however, must reject this reasoning as nonsensical. In order to preserve the integrity and validity of medical monitoring claims, there must be a date certain on which an individual's injury occurs, *i.e.*, a person's injury under medical monitoring, like all other causes of action, only accrues at one time. For example, in Mr. Barnes' case, Mr. Barnes was injured—he sustained an increased risk of contracting a serious latent disease—in 1979 under Dr. Burns' program and in approximately 1984 under the Petty–Hyers Program. Thus, Mr. Barnes only had, at the outside, two years from 1984 to sue for medical monitoring.
Plaintiffs cannot avoid the statute of limitations by claiming that a new injury arises each time Mr. Barnes becomes entitled to participate in a more advanced medical monitoring program. The types of tests that a plaintiff becomes entitled to participate in at each sub-level of a medical monitoring program do not at all effect the timing of when the plaintiff's right to bring a medical monitoring claim accrues. If plaintiffs' position was accepted, plaintiffs could forever avoid the bar of the statute of limitations by simply

constructing many different levels in their medical monitoring program and claiming that each plaintiff has recently satisfied these requirements, even if the plaintiff had knowledge of his injury and its cause for many years. This result is anathema to our system of jurisprudence, which provides stability to everyday life by ensuring that stale claims will not be cognizable in a court of law.

**14.** Ciaran McNally has only been smoking for approximately eleven years; her claim could not have accrued until sometime last year. Thus, the statute of limitations would not bar her claim.

**15.** Courts in this Circuit have long held that general references to the time when a claim accrued, as long as that time was outside the statute of limitations period, are sufficient to bar a claim as a matter of law. *See Kichline,* 800 F.2d at 357; *Czyzewski v. Consolidated Rail Corp.,* No. CIV.A.96–3716, 1997 WL 9791 (E.D.Pa. Jan.9, 1997); *Souders v. Atlantic Richfield Co.,* 746 F.Supp. 570 (E.D.Pa.1990).

bility, due to facts and circumstances not within his control, to discover an injury despite the exercise of due diligence." *Kingston*, 690 A.2d at 288. Thus, to the extent these five plaintiffs were unable to discover their injury due to facts not within their control, the Court will apply the discovery rule. Under the discovery rule, the statute of limitations begins to run when the "plaintiff knows, or in the exercise of reasonable diligence should have known, (1) that he has been injured, and (2) that his injury has been caused by another's conduct." *Bradley*, 633 A.2d at 194. The plaintiff has the burden of proving that he exercised reasonable diligence in bringing his claim. Reasonable diligence is "an objective, rather than a subjective standard. Under this standard, the plaintiff's actions must be evaluated to determine whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Cochran*, 666 at 249.

Applying these principles to the facts of this case, the Court finds that each of these five plaintiffs knew, or should have known, that smoking cigarettes put him or her at a significantly increased risk of contracting a serious latent disease years before they filed the instant suit. Thus, the medical monitoring claims of these five plaintiffs are barred by the statute of limitations. When a Court is asked to apply the discovery rule, the relevant question posed is whether an ordinary person, exercising reasonable diligence, would have known or should have known of his injury and its cause. In this case, each plaintiff should have known or did know that smoking caused them to be placed

at an increased risk of contracting a serious latent disease.

Since the 1980s, every doctor seen by Mr. Barnes for hypertension has told him to stop smoking. (Barnes Dep. at 92). Dr. Brownstein, his doctor in the mid–1980s, took Barnes' cigarettes and threw them away every time Barnes came in for a visit. *Id.* at 35–36. Indeed, Mr. Barnes stated that at the time of these visits in the 1980s, he "kn[e]w that cigarettes are no good for you if you have any type of lung disease." (Barnes Dep. at 36). Further, Mr. Barnes stated that he believed that his father's death from lung cancer was partially caused by smoking. (Barnes Dep. at 128–29). Finally, Mr. Barnes testified at deposition that none of the warnings on cigarettes, which inform smokers of the risks of smoking, provided him with any information that he already did not possess. (Barnes Dep. at 156–57). Based on these facts, it is obvious that Barnes knew that smoking caused him to be placed at an increased risk of contracting a serious latent disease by at least the mid–1980s. Because Mr. Barnes knew of his injury and its cause, Barnes should have filed suit for his medical monitoring claim by the end of 1992, which he failed to do. Thus, his claim is time-barred.

Ms. Potts has likewise known for years that smoking put her at an increased risk of contracting a serious latent disease. By her own admission, Potts learned "for sure" that cigarette smoking created an increased risk of disease in 1966, when the Surgeon General's first warnings were put on cigarette packages.[16] In addition, and more importantly, Ms. Potts was informed by her cardiologist in the late 1980s that she was at

---

**16.** To the extent that plaintiffs' raise a "reverse preemption" argument, this Court rejects such an argument. The "reverse preemption" doctrine, first discussed in *Cipollone v. Liggett Group, Inc.*, 893 F.2d 541 (3d Cir.1990), *aff'd in part, rev'd in part*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), had nothing whatsoever to do with notice or statute of limitations issues. Instead, in *Cipollone*, the defendants were prevented from affirmatively using plaintiff's knowledge of cigarette warning labels to establish comparative negligence under the New Jersey Comparative Negligence Act on a duty to warn claim. *Id.* at 555–59. At no point did the Third

Circuit in *Cipollone* hold that a plaintiff's post-warning knowledge could not be introduced by the defendant for any purpose. To the contrary, the court held that this knowledge was relevant to whether the plaintiff had mitigated her damages. Thus, plaintiff's reliance on the reverse-preemption doctrine is misplaced and plaintiffs' knowledge of the warnings remains relevant to the statute of limitations. However, even if the Court did not consider plaintiff's knowledge of the warning labels, plaintiffs still would possess the requisite knowledge of their injury and its cause so that their claims would still be time-barred.

a significantly increased risk of contracting heart disease, in the form of clogged arteries, from smoking. (Potts Dep. at 95–97). In fact, she has already been informed that she has contracted such heart disease. *Id.* Ms. Potts also was told by her doctors in 1991 that "she needs to stop smoking due to the fact that [her vocal cord problem] could become a malignant problem." (Defs.' Mot. Summ. J. Statute Limitations Ex. 11). It is clear from her own testimony that Ms. Potts knew that smoking placed her at a serious risk of disease in 1966 and continuously through the 1980s and 1990s. Even assuming that the discovery rule tolled Ms. Potts' claim until 1991, when her doctors told her that her vocal cord problem could become malignant, Ms. Potts' medical monitoring claim is still untimely.

Ms. Rodweller has known since the late 1950s or early 1980s that smoking created an increased risk of contracting a serious latent disease. Ms. Rodweller first learned the danger of smoking from her doctors. As early as 1959, for instance, Rodweller was told by a doctor that smoking would put scar tissue on her vocal cords and it was in that year that she realized that "cigarettes affected [her] body." (Rodweller Dep. at 120, 200–01). Since this time, Ms. Rodweller admits that all of her doctors have advised her to quit smoking because "[i]t can make [her] ill" and because "[she] was a good candidate for emphysema." (Rodweller Dep. at 151). In addition, Ms. Rodweller knew in 1985 that pleurisy, a severe chronic lung disorder, was associated with cigarette smoking, and she told her daughter that it could happen to her if she did not stop smoking. (Hand Dep. at 23–25). Based on Ms. Rodweller's own sworn testimony, it is clear that at a minimum, Ms. Rodweller knew of, or should have known, that cigarette smoking placed her at an increased risk of contracting a serious latent disease. Thus, Ms. Rodweller's claim is time-barred.

Ms. Salzman also knew long ago that smoking significantly increased her risk of contracting a serious latent disease. In the 1980s, one of Salzman's doctors told her to stop smoking. The doctor explained, "it's really bad for you, you can get emphysema,

cancer." (Salzman Dep. at 34). This information was confirmed by two separate anesthesiologists. (Salzman Dep. at 30–31). In addition to being directly told by her doctors that she could contract these diseases, Ms. Salzman urged her son, throughout the 1980s, to quit smoking because of the dangers of smoking. (Richard Salzman Dep. at 47; Arthur Salzman Dep. at 74–75). Furthermore, Ms. Salzman attended a "Smokers Enders Program" in the 1980s because she wanted to quit due to the risks of smoking. (Salzman Dep. at 146). From these facts, a reasonable juror could not otherwise conclude that Ms. Salzman knew of the risks of contracting a serious latent disease from smoking as early as the mid–1980s. Hence, her medical monitoring claim is time-barred.

Finally, Mr. Slivak similarly believed years ago that smoking significantly increased his risk of contracting a serious latent disease. After 1985, Mr. Slivak had read the warnings on the packages of cigarettes. (Slivak Dep. at 34–35). In addition, in the early 1980s, Slivak discussed with his family that smoking may have been the cause of his wife's cancer. (Slivak Dep. at 30–31). More importantly, Slivak's doctors connected smoking to his heart disease. In the 1980s, three or four separate physicians told Slivak that smoking was part of the reason that he was experiencing heart troubles. (Slivak Dep. at 15–16). Further, during two separate hospital visits in 1989 and 1993, Slivak was instructed not to smoke by his doctors. (Slivak Dep. at 61–67). Finally, from 1982 to 1988, Slivak warned his daughter that smoking could cause cancer. (Steep Dep. at 18). Based on these facts, no reasonable juror could otherwise conclude that Mr. Slivak knew of the his injury—that he was at a significantly increased risk of contracting a latent disease—and its cause—smoking. Therefore, Mr. Slivak's medical monitoring claim is time-barred.

Plaintiffs advance one final argument against finding that the claims of these five plaintiffs are barred by the statute of limitations. Plaintiffs contend that the statute of limitations should not be applied because their medical monitoring claims could not have been brought earlier due to the fact

that medical monitoring is a relatively new cause of action. In disposing of this argument, the Court first notes that this argument directly contradicts plaintiffs' argument that this claim can be certified because it is not an immature tort. Second, several Pennsylvania cases in the 1980s discussed the common law cause of action for medical monitoring. *See Peterman v. Techalloy Co., Inc.,* 29 Pa. D. & C.3d 104 (Montgomery County C.C.P.1982); *Habitants Against Landfill Toxicants v. City of York,* No. CIV.A.84–S–3820, 1985 WL 19991 (York County C.C.P. May 20, 1985). And the federal district courts in Pennsylvania have been adjudicating medical monitoring claims since the early 1980s. *See In re Three Mile Island Litig.,* 87 F.R.D. 433 (M.D.Pa.1980); *Linkous v. Medtronic, Inc.,* No. CIV.A.84–1909, 1985 WL 2602 (E.D.Pa. Sept.4, 1985); *Villari v. Terminix Int'l, Inc.,* 663 F.Supp. 727 (E.D.Pa.1987). Finally, in 1990 the Third Circuit explicitly cited this authority and unambiguously stated, "We agree with *Merry [v. Westinghouse Elec. Corp.,* 684 F.Supp. 847 (M.D.Pa.1988) ], and predict that the Supreme Court of Pennsylvania would follow the weight of the authority and recognize a cause of action for medical monitoring." *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 852 (3d Cir.1990) ("*Paoli I*"). *Paoli I* was handed down six full years before the plaintiffs, here, filed their complaint; thus, even if the Court were to toll the plaintiffs' statute of limitations until *Paoli I* was handed down, the claims of the five plaintiffs discussed above would still be time-barred.

In sum, the Court will grant in part and deny in part defendants' motion for summary judgment based on the statute of limitations. The motion is denied to the extent that defendants seek summary judgment against Ms. McNally; it is, however, granted to the extent that they seek summary judgment against William Barnes, Catherine Potts, Norma Rodweller, Barbara Salzman and Edward Slivak.

### IV. Affirmative Defenses

Defendants also move for summary judgment against Ciaran McNally, William Barnes and Catherine Potts on the grounds that their claims are barred by the affirmative defenses of contributory negligence, assumption of risk and consent to exposure to a hazardous substance.[17] Because summary judgment has been entered against Mr. Barnes and Ms. Potts, the Court will only consider defendants' arguments against Ms. McNally. In this regard, defendants argue that Ms. McNally knew, before she began smoking cigarettes on a regular basis, that smoking cigarettes significantly increased her risk of contracting a serious latent disease. Defendants also claim that the undisputed facts of the record also establish that, well before making any serious effort to quit smoking, Ms. McNally knew that smoking cigarettes significantly increased her risk of contracting a serious latent disease. Based on these reasons, defendants contend that Ms. McNally's claim is barred by the doctrines of contributory negligence, assumption of risk and consent.

In response, plaintiff[18] rejoins that none of these defenses bar her medical monitoring claim for the following reasons. First, the defenses of contributory negligence, assumption of risk and consent are barred by the equitable doctrine of unclean hands. Second, the defenses of contributory negligence, assumption of risk and consent are inapplicable to the facts of this action and unavailable to the defendants. Third, public policy prohibits assertion of contributory negligence, assumption of risk and consent under the circumstances of this case.

To begin, plaintiff urges this Court to exercise its equitable powers to bar defendants from asserting its affirmative defenses because of defendants' intentional and fraudulent conduct towards plaintiffs. (Pls.' Br. at 2, 70–74). The Court, however, will not do so. Plaintiff, first, cannot argue that defen-

---

**17.** Although defendants do not agree that plaintiffs can proceed on theories of intentional tort or strict liability under a medical monitoring claim, defendants assume for the purposes of this motion that plaintiffs can proceed on these theories.

**18.** Because the Court has already held that summary judgment will be entered against five of the six plaintiffs, the Court will use the word "plaintiff" to refer solely to Ms. McNally.

dants have engaged in fraudulent conduct because she has dropped any fraud counts from the complaint. In addition, plaintiffs' counsel represented to this Court during the class certification hearing that plaintiffs do not assert a fraud or misrepresentation claim: "We never said misrepresentation. We don't have a fraud or misrepresentation count in this Complaint. The law in Pennsylvania is not good on a class-wide basis for that particular issue. The law is relatively clear, for example, under our consumer protection statute that individual issues of reliance when you talk about advertising, that those issues are individual." (Transcript of Proceedings dated March 6, 1997 at 16–17). Because plaintiffs have chosen not to maintain fraud claims, in order to increase their chances of succeeding on the class certification issue, the plaintiffs cannot now reintroduce these claims under the guise of mere factual allegations. Thus, the Court cannot bar defendants from asserting affirmative defenses on the grounds that they have acted fraudulently because fraud, simply put, is not part of the case anymore.

■■■ Further, it is law as set forth by both the United States Supreme Court and the Pennsylvania Supreme Court that the equitable doctrine of unclean hands may be applied only against one seeking equitable relief. The unclean hands doctrine is based upon the age-old maxim that "he who comes into equity must come with clean hands." A court may not, however, use its equitable powers to deprive defendants of a legal right to which they would otherwise be entitled in an action at law. The theories asserted by plaintiff in this present action, i.e., negligence, strict liability and intentional tort, to support their claim for equitable relief, are legal, not equitable, theories. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, §§ 28, 98, 105 (5th ed.1984). Indeed, plaintiff acknowledges that the affirmative defenses set forth by defendants are "legal defenses." (Pls.' Br. at 72).

■■■ It is well-settled that a party may assert both equitable and legal defenses in an action in equity. See Liazis v. Kosta, Inc., 421 Pa.Super. 502, 618 A.2d 450 (1992). In the seminal case of Manufacturers' Finance Co. v. McKey, 294 U.S. 442, 55 S.Ct. 444, 79 L.Ed. 982 (1935), the United States Supreme Court, quoting in part the Pennsylvania Supreme Court, held that a court in equity could not deprive a party of its legal rights based on the unclean hands doctrine or the related maxim "he who seeks equity must do equity." The Manufacturers court stated:

The mere fact that a party is obliged to go into a federal court of equity to enforce an essentially legal right ... under controlling state law does not authorize that court to modify or ignore the terms of the legal obligations upon the claim, [just] because the court thinks, that these terms are harsh or oppressive or unreasonable. A party may stand upon the terms of a valid contract in a court of equity as he may in a court of law. "If he asks no favors, he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases, and do equity in order to get equity." The petitioner here did not seek equitable relief. It sought an enforcement of its legal rights; and, as said by the Supreme Court of Pennsylvania, "Legal rights are as safe in chancery as they are in a court of law, and, however strong an appeal may be to the conscience of a chancellor for equitable relief, he is powerless to grant it if the one from whom it must come will be deprived of a legal right." Colonial Tr. Co. v. Central Tr. Co., 243 Pa. 268, 276, 90 A. 189, 191 [ (1914) ]. The maxim "he who seeks equity must do equity" presupposes that equitable, as distinguished from legal, rights, substantive or remedial, have arisen from the subject-matter in favor of each of the parties; and it requires that such rights shall not be enforced in favor of one who affirmatively seeks their enforcement except upon condition that he consent to accord to the other his correlative equitable rights.

Id. at 448–49, 55 S.Ct. at 447 (citations omitted) (emphasis added). In deciding whether the District Court could invoke its equitable powers to strip the petitioner of its legal

rights, the Supreme Court, in reversing the lower court, stated that:

> As already appears from what has been said, the decrees below rest wholly on the untenable assumption that petitioner's rights are subject to denial or curtailment in virtue of equitable principles applicable only against one who affirmatively has sought equitable relief; and here that was not the case. The question, or extent, of petitioner's legal rights, relieved of this assumption, has been neither determined nor considered upon the facts or the applicable law.

*Id.* at 453, 55 S.Ct. at 449. Based on the Supreme Court's reasoning in *Manufacturers'*, it is clear that a court, sitting in equity, cannot invoke its equitable powers to strip a party of its legal rights, whether these rights be claims or defenses.

The Pennsylvania courts have also followed *Manufacturers'* holding that a party's legal rights may not be precluded by a court sitting in equity. The Supreme Court of Pennsylvania cited *Manufacturers'* with approval in *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968). In *Moon Motor*, the Supreme Court stated, in declining to apply the unclean hands doctrine to deny plaintiff a legal right, that:

> [A]lthough it has been said that *the clean hands doctrine* applied in courts of law as well as in courts of equity, it generally has been held that the doctrine *operates only to deny equitable, and not legal, remedies.* The plaintiff in this case was granted, not a special equitable remedy, but only a money decree. In effect, Universal received what it would have if the action had been at law in assumpsit. We are not persuaded that the clean hands doctrine should be applied to deny plaintiff this legal right.

*Universal Builders*, 430 Pa. at 555–56, 244 A.2d 10 (emphasis added). *See also Houghten v. Restland Memorial Park*, 343 Pa. 625, 23 A.2d 497 (1942) (holding that a court of

equity cannot deprive a party of its legal rights).

■ The lessons from these cases are two-fold. First, legal defenses do not become equitable defenses simply because they are asserted in an action in equity. Second, equitable principles such as the doctrine of unclean hands may not be used to deprive a defendant of legal rights—remedies or defenses. Applying these lessons, the Court finds that defendants have a legitimate right to raise the legal defenses of contributory negligence, assumption of risk and consent.[19] Therefore, the Court cannot exercise its equitable powers to deprive defendants of their legal rights. In addition, as this Court has noted *supra* and by way of prior order, this case is not purely an equitable action; indeed, it implicates both legal and equitable rights. Thus, it would be even less appropriate for this Court to exercise its equitable powers to bar defendants from asserting it affirmative, legal defenses. Thus, the Court will not do so.

The Court also will not exercise its inherent equitable powers to bar defendants' affirmative defenses based upon consideration of public policy. The law as expressed by the United States Supreme Court in *Manufacturers'* makes it clear that a court cannot utilize its equitable powers to deny parties their legal rights under controlling state law regardless of how strong an appeal is made to the conscience of the court. *See Manufacturers', supra.* Indeed, the affirmative defenses of contributory negligence, assumption of risk and consent are the product of public policy developed over centuries and remain the law in the Commonwealth of Pennsylvania. In the face of the substantial public policy reasons for allowing defendants to assert affirmative defenses, plaintiff must come forward with substantial public policy reasons and authority to support the extraordinary position that this Court should deprive defendants of their legal rights. Plaintiff has failed in this regard; indeed, she cited no cases to support her position.

---

19. The Court recognizes that consent and assumption of risk are technically not defenses in that a plaintiff must prove lack of consent as part of his intentional tort and that the assumption of risk analysis, under Pennsylvania law, may more properly be characterized as part of the duty analysis. However, for the purposes of this section of the memorandum, the Court will refer to consent and assumption of risk as affirmative defenses.

In contrast to plaintiff's position, the Supreme Court of Pennsylvania has stated:

> Even recognizing that a court of equity has broad powers, "[i]t is a mistake to suppose that a court of equity is amenable to no law, either common or statute, and assumes the rule of an arbitrary legislator in every particular case," *Blackstone's Commentaries on the Law* 732 (B. Gavit ed.1941). When the rights of a party are clearly established by defined principles of law, equity should not change or unsettle those rights. *Equity follows the law.*

*First Federal Sav. & Loan Ass'n of Lancaster v. Swift,* 457 Pa. 206, 210, 321 A.2d 895, 897 (1974). It has also been said that "a court of equity follows and is bound by rules of law, and does not use equitable considerations to deprive a party of his rights at law." *Bauer v. P.A. Cutri Co. of Bradford,* 434 Pa. 305, 310, 253 A.2d 252, 255 (1969). "It is certainly not true that a chancellor in equity has the boundless discretion to do as he sees fit. Rather, it is well-established that a chancellor in equity must follow clearly fixed and established principles of law." *Wade v. S.J. Groves & Sons Co.,* 283 Pa.Super. 464, 472, 424 A.2d 902 (1981).

Applying these principles here, the Court concludes that it would be inappropriate to deprive defendants of their affirmative, legal defenses. Indeed, the law of Pennsylvania and the United States Supreme Court clearly holds that no matter the appeal to the conscience of the chancellor, a court in equity cannot deprive a party its entitlement to its legal rights. Although this Court recognizes that important public policy considerations are implicated by plaintiff's claim, counterbalanced against these interests are those public policy considerations that have long formed the bedrock upon which defendants' affirmative defenses rest. In light of the many cases cited above, which form an important thread of our equity jurisprudence, this Court will not, and cannot, properly deprive defendants of their legal rights. Once a Court assumes the authority to deprive litigants of their well-established and cherished legal rights, the central principles of our judicial system—impartiality and neutrality—are forever weakened. This Court will not assist in this endeavor.

Because defendants are entitled to assert their affirmative defenses, the Court must now decide whether defendants are entitled to summary judgment against Ms. McNally on their affirmative defenses. The first defense raised by defendants is that of contributory negligence; the Court thus turns to this issue.

As a threshold question, and in order to resolve a dispute of the parties, the Court must decide whether comparative or contributory negligence will apply to this case. Looking to guidance from the courts of Pennsylvania, this Court finds that this issue has never been addressed. Thus, this Court, as a court sitting in diversity and applying Pennsylvania law, must predict how the Pennsylvania Supreme Court would rule. The Pennsylvania Comparative Negligence Act, 42 Pa. Cons.Stat. Ann. § 7102(a), by its express language is applicable only to "actions brought to recover damages for negligence resulting in death or injury to person or property...." In their Second Amended Complaint, the plaintiffs do not seek damages, but rather a court-supervised monitoring program to detect serious latent diseases for which plaintiffs are at a significantly increased risk as a result of smoking the defendants' cigarettes. Moreover, both the defendants and plaintiffs are alleged to have been negligent. From these facts, it appears that contributory negligence would apply in lieu of comparative negligence. *Commonwealth Federal Sav. & Loan Assoc. v. Pettit,* 137 Pa.Cmwlth. 523, 586 A.2d 1021 (1991).

Despite this appearance however, the Court finds that if the Supreme Court of Pennsylvania was presented with this issue, it would find that the nature of a medical monitoring claim brings it within the purview of the Comparative Negligence Act. A close review of the nature of a medical monitoring claim indicates that this claim is exactly the type of claim that normally would be covered by the Comparative Negligence Act. Indeed, the Pennsylvania Supreme Court has acknowledged that the basis of a medical monitoring claim is medical examination tests necessary to detect future onset of physical

harm. *Redland Soccer,* 696 A.2d 137. In order to prove an entitlement to medical monitoring, a plaintiff must prove negligence on the part of defendant. The Supreme Court of Pennsylvania has also stated that, under medical monitoring, plaintiffs may seek monetary damages. From these observations, it is clear that a medical monitoring claim that requests lump sum damages would qualify as an "action[ ] brought to recover damages for negligence resulting in death or injury to person or property . . . ."

The only aspect that would take a medical monitoring claim out of the Comparative Negligence Act is the fact that a plaintiff can seek equitable relief under his or her medical monitoring claim. Indeed, the plaintiffs here have sought equitable relief. However, the question which arises is whether a plaintiff should be subjected to the harsh doctrine of contributory negligence when he exercises his right to seek equitable relief in lieu of monetary damages under a medical monitoring claim. This Court thinks not.

The Pennsylvania Supreme Court has expressly encouraged the use of medical monitoring funds in Pennsylvania because of their advantages over lump-sum damages. *Id.* at 142 n. 6. In *Redland Soccer,* the Supreme Court noted the advantages of using a fund, as opposed to awarding monetary damages, including the trial court's ability to administer the fund, to ensure that plaintiffs' use the money for testing, and to control the cost to defendants. *Id.* Clearly, the Supreme Court was encouraging the use of funds over monetary damages because of these advantages. However, if courts were to apply the anachronistic doctrine of contributory negligence to bar plaintiffs from recovering under their medical monitoring claims, then plaintiffs would be discouraged from requesting the relief of a medical monitoring fund. This result would be contrary to the result that the *Redland Soccer* court intended. Thus,

for these reasons, this Court finds that the Supreme Court of Pennsylvania would not apply the doctrine of contributory negligence to medical monitoring claims, but rather it would apply the Comparative Negligence Act. The application of the Comparative Negligence Act to these claims would more properly advance the goals of the *Redland Soccer* court, and would also adequately protect the rights of defendants. With this said, the Court turns to the question of whether Ms. McNally was comparatively negligent.

 In the instant case, if defendants can be deemed negligent for exposing plaintiffs to cigarettes, then plaintiff, who knew or should have known of the increased risks of contracting serious latent diseases due to smoking, yet proceeded to smoke cigarettes, should be deemed to be negligent herself. Thus, the question posited is whether Ms. McNally, the remaining plaintiff, either knew or should have known of the increased risk of contracting a serious latent disease from exposure to cigarettes. The Court finds that a genuine issue of material fact exists with respect to this issue. Although evidence exists that indicates that Ms. McNally knew that cigarettes were "bad" or "dangerous" in a general sense, there simply does not exist enough evidence on the record that would suggest that she knew or should have known, as a matter of law, that smoking placed her at a significantly increased risk of contracting a serious latent disease. Thus, the motion is denied to the extent it seeks judgment on negligence grounds.

 The assumption of risk doctrine is applicable to both negligence and strict liability claims.[20] In a negligence action, where the plaintiff was aware of a risk and faced it voluntarily, the defendant is relieved of his or her duty to protect the plaintiff from such risk. *Howell,* 533 Pa. at 162–63, 620 A.2d 1107. The essential elements of the assumption of risk doctrine are the plaintiff's

---

20. The Court notes that the assumption of risk doctrine is currently undergoing some major changes in the Commonwealth of Pennsylvania. In *Howell v. Clyde,* 533 Pa. 151, 620 A.2d 1107 (1993), the Supreme Court indicated that, if the plaintiff's assumption of risk is established as a matter of law, then the defendant is deemed to have owed no duty to the plaintiff to protect him

or her from harm in the first instance. In that context, assumption of risk, is no longer "a defense," but rather simply obviates the defendant's duty. Whatever the current state of law in Pennsylvania with respect to assumption of risk, for the purposes of this motion, the "duty" distinction is irrelevant.

subjective understanding of the risk, voluntary choice to encounter the risk, and willingness to accept that risk. *See Barrett v. Fredavid Builders, Inc.*, 454 Pa.Super. 162, 685 A.2d 129 (1996). In a negligence action, the assumption of risk analysis is a question of law for the court, and is not for the jury. *Howell*, 533 Pa. at 162–63, 620 A.2d 1107. If the court determines that assumption of risk is inapplicable, the jury is to be charged only as to comparative negligence. *Id.* at 163, 620 A.2d 1107. In a strict liability action, however, the plaintiff's assumption of risk is an affirmative defense to liability and may proceed to the jury where there is a dispute of material fact. *See Kupetz v. Deere & Co., Inc.*, 435 Pa.Super. 16, 644 A.2d 1213 (1994).

To prove assumption of risk in either the negligence or strict liability context, the evidence must demonstrate that the plaintiff subjectively knew of the risk and deliberately proceeded to act in spite of it. *Barrett*, 685 A.2d at 131. However, the application of this doctrine is very narrow. A defendant must show that the "nature and extent" of the risk were "fully appreciated" and that the plaintiff voluntarily proceeded to face that risk. *Childers v. Power Line Equip. Rentals, Inc.*, 452 Pa.Super. 94, 681 A.2d 201, 208 (Pa.Super.1996). "It is well established in Pennsylvania that the assumption of the risk defense requires knowledge of the specific defect eventually causing injury and the voluntary use of the product with knowledge of the danger caused by the specific defect." *Dougherty v. Royal Zenith Corp.*, 1991 WL 151913 (E.D.Pa. Aug. 1, 1991) (citation omitted). Accordingly, in order to preclude a plaintiff from recovering because he assumed the risk, the defendant must establish that plaintiff had knowledge of and appreciation of the precise risk involved.

Applying these principles to the record here, the Court finds that defendants have been unable to establish that they are entitled to summary judgment against Ms. McNally. Ms. McNally alleges that defendants engaged in various conduct which she did not have the ability to appreciate, nor even have knowledge about. As such, she claims that she cannot be precluded from asserting her claim due to assumption of risk. The Court agrees. Defendants simply have not produced evidence, at the summary judgment, that would establish that plaintiff assumed the specific risk and appreciated this risk.

Conversely, the Court also rejects plaintiffs' argument, that no person could have ever assumed the risks associated with cigarette smoking due to defendants' conduct. Plaintiff argues that defendants engaged in all types of untoward conduct and that this conduct was concealed, and as such, she could have never assumed the specific risk. However, on the record before this Court, it is not entirely clear that defendants ever engaged in this conduct; and if they did engage in this conduct, it is not clear whether plaintiff could not have had knowledge of this particular risk and appreciated and confronted it. In sum, the Court finds that the issue of assumption of risk is a question for the jury with respect to plaintiff's strict liability theory, and that the issue of assumption of risk with respect to plaintiff's negligence theory must be reserved.

The Court now turns to defendants' consent argument. In plaintiffs' Second Amended Complaint, plaintiffs allege that defendants intentionally exposed them to hazardous substances. Under Pennsylvania law, claims for intentional exposure to hazardous substances are predicated on a theory of battery. *Field v. Philadelphia Electric Co.*, 388 Pa.Super. 400, 565 A.2d 1170, 1178 (1989). To establish an intentional tort claim under a battery theory, the plaintiff must prove, as an essential element of her claim, that she did not consent to the tortious conduct. *See Levenson v. Souser*, 384 Pa.Super. 132, 146, 557 A.2d 1081, 1088 (1989), *alloc. denied*, 524 Pa. 621, 571 A.2d 383 (1989). Thus, in reality, consent is an element of plaintiff's claim as opposed to a true affirmative defense. *See Keeton, supra,* § 18.

Express consent may be given by words or affirmative action and implied consent may be manifested when a person takes no action, indicating an apparent willingness for the conduct to occur. *Id.* at 130 (citing

Restatement (Second) Torts § 892 cmt. b & c). Consent to an intentional tort is comparable to assumption of risk under negligence principles. *See* Restatement § 892A cmt. a. "One who effectively consents to the conduct of another intended to invade his interests cannot recover in an action of tort for the conduct or for the harm resulting from it." Restatement § 892A(1). "Consent avoids recovery simply because it destroys the wrongfulness of the conduct as between the consenting parties, however harmful it might be to the interests of others." Keeton, *supra*, at 113.

As with assumption of risk and its requirement that the plaintiff know, appreciate and accept a particular risk, the defense of consent is conduct specific. Restatement (Second) of Torts § 892 cmt. a. In order to be barred because of consent, plaintiff must have consented to the defendant's conduct, not just the harm that followed. *Id.* at cmt. e. In addition, a plaintiff's consent to one aspect of a defendant's conduct will not insulate a defendant from liability for other acts. A plaintiff may be held to have consented to only certain conduct, but to have withheld consent with respect to other conduct. *See, e.g., McCabe v. Village Voice, Inc.*, 550 F.Supp. 525, 529 (E.D.Pa.1982). Conduct in excess of that consented to is not protected by the consent actually given. *Id.*

In this case, defendants argue that no reasonable fact finder could dispute that Ms. McNally voluntarily chose to use a legal product replete with warnings by the Surgeon General concerning the dangers of using said product. Defendants claim that Ms. McNally knew that cigarette smoking could pose a substantial risk of contracting a latent disease, but despite this knowledge, she consented voluntarily to such exposure by beginning to smoke cigarettes on a daily basis and later continuing to smoke cigarettes, making little or no effort to try to quit smoking for the majority of her "smoking life." For these reasons, defendants contend that Ms. McNally consented to any exposure to cigarettes.

Although this argument is persuasive, Ms. McNally contends that she could not have consented to exposure to defendants' cigarettes because she lacked the crucial information about the nature of the product. Plaintiff argues that defendants withheld information from her—evidence that many of the risks are not inherent, including evidence that the addictiveness and ill health effects of cigarettes are the result of deliberate industry decisions to increase the risk of harm through additives and manipulation of nicotine, to withhold safer and less addictive alternatives—which precludes defendants from claiming that she consented to exposure to the hazardous substances in cigarettes.

In light of plaintiff's allegations, the Court must deny defendants' motion for summary judgment on consent grounds because there exists genuine issues of material fact. A factual question exists as to whether defendants engaged in certain conduct and as to whether Ms. McNally was aware of this conduct. If defendants did engage in the alleged conduct, and Ms. McNally was unaware of this conduct, then defendants cannot claim that Ms. McNally consented to defendants' allegedly intentional conduct that exposed Ms. McNally to hazardous substances.

In sum, the Court must deny defendants' summary judgment concerning plaintiffs' contributory negligence, assumption of risk and consent to exposure to hazardous substances because there exists genuine issues of material fact.

## V. Medical Monitoring

Defendants also argue that summary judgment should be entered in their favor on plaintiffs' medical monitoring claim. Defendants argue that they are entitled to summary judgment for at least four reasons. First, the opinions offered by plaintiffs' medical monitoring experts in support of the proposed medical monitoring program do not meet the requirements for admissibility under Rule 702 of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Second, plaintiffs' proposed testing cannot be found "reasonably necessary" under Pennsylvania law

where their experts concede that the proposed monitoring is contrary to accepted medical practice. Third, plaintiffs cannot meet their burden of establishing entitlement to medical monitoring because their experts have not assessed the medical history and condition of any plaintiff and therefore cannot give opinions that monitoring is either necessary for any plaintiff or would not be prescribed if the plaintiffs did not smoke. Fourth, undisputed evidence relating to each plaintiff negates plaintiff's entitlement to medical monitoring, in whole or in part.

Of course, plaintiffs ask this Court to deny defendants' motion, claiming it lacks any merit. Specifically, plaintiffs first argue that defendants' motion should be denied because it is contingent on the exclusion of plaintiffs' expert testimony. Plaintiffs assert that their proposed medical monitoring program is designed to monitor a high risk population for three diseases and that this program is properly aimed at detection, not prevention or treatment, and must be evaluated in light of this objective. From this point of view, plaintiffs submit that the early diagnosis of the diseases to be screened will provide a benefit to plaintiffs even if the diseases cannot be prevented or cured at this time.

Finally, plaintiffs argue that genuine issues of material fact exist which preclude the entry of summary judgment. In this regard, plaintiffs explain that plaintiffs' proposed medical monitoring program is different from general medical screening normally recommended for persons who are at high-risk for smoking related diseases. In addition, plaintiffs argue that it is not necessary that they establish on an individual basis that their medical monitoring program would be different from that normally recommended. Plaintiffs further contend that their proposed medical monitoring program is reasonably necessary because it provides a means of disease detection. In sum, plaintiffs conclude that the elements challenged by defendants in their motion involve factual determinations to be made by the trier of fact.

■ Because the Court has stated that it will grant summary judgment in favor of defendants and against five of the plaintiffs, and because the Court finds that Ciaran McNally cannot satisfy the elements of *Redland Soccer*, the Court will turn directly to defendants' final argument that the undisputed evidence relating to Ms. McNally negates her entitlement to medical monitoring.[21]

Under the Burns Program, Ms. McNally is only entitled to participate in the first level of the proposed medical monitoring program. Under the first level, Ms. McNally would be entitled to receive, annually or bi-annually, a physical examination, cardiovascular risk assessment and an EKG. However, Ms. McNally herself does not seek monitoring in the form of an EKG. (Defs.' Mot. Summ. J. Medical Monitoring Ex. 1 Pls.' Resp. Interrog. 10). Thus, the only monitoring that Ms. McNally seeks, and would be qualified for under the Burns Program, is a physical examination and cardiovascular risk assessment.

Defendants argue that Ms. McNally is not entitled to this testing because the sixth element of *Redland Soccer* requires her to prove that the proposed medical monitoring regime "is different from that normally recommended in the absence of the exposure." *Redland Soccer*, 696 A.2d at 146. Defendants argue that Ms. McNally is clearly not entitled to the physical examinations and cardiovascular risk assessment because it is recommended that the entire adult population receive these tests.[22]

Because annual physical examinations and cardiovascular risk assessment are routinely recommended to all persons in the absence of exposure, the Court finds Ms. McNally can not establish that "the prescribed regime is different from that normally recommended in the absence of the exposure." *Id.* The sixth

---

**21.** Although the Court believes that defendants have raised other meritorious arguments in their motion, the Court, in the interests of efficiency and economy, will not address these arguments.

**22.** It is noted that defendants made this argument as to each and every plaintiff; however, because the Court has already stated that it will enter summary judgment against the other plaintiffs due to the statute of limitations, the Court will only address defendants' argument as it relates to Ms. McNally.

element of the *Redland Soccer* test "mirrors the Third Circuit's requirement" in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 718 (3d Cir.1994) ("*Paoli II*"), that the monitoring regime be "different than the one that would have been prescribed in the absence of the particular exposure." *Barnes v. American Tobacco Co.*, 176 F.R.D. 479 (E.D.Pa. 1997) (quoting *Paoli II*, 35 F.3d at 788 n. 53). The substance of this requirement is to ensure that "a plaintiff may recover only if the defendant's wrongful acts increased the plaintiff's incremental risk of incurring the harm produced by the toxic substance enough to warrant a change in the medical monitoring that otherwise would be prescribed for that plaintiff." *Redland Soccer*, 696 A.2d at 144 (quoting *Paoli II*, 35 F.3d at 788).

Here, Ms. McNally only seeks monitoring for two tests which would be recommended for her even if she did not smoke. Any increase in Ms. McNally's incremental risk of incurring the harm produced by the allegedly hazardous substances in cigarettes would not warrant a change in the medical monitoring that would be prescribed for her. Indeed, in the absence of exposure, it would be recommended that she receive the tests she seeks under her medical monitoring claim. Thus, she cannot satisfy the sixth element of *Redland Soccer*.

Plaintiffs argue that summary judgment is not appropriate on this ground because the medical monitoring program that they advance is sufficiently different from one that they would receive in the absence of exposure. In *Redland Soccer*, plaintiffs' expert suggested a plan which consisted of eight different examinations, each of which was "not out of the ordinary," but consistent with the battery of tests generally recommended for the populations at risk for adult cancer. *Redland Soccer*, 696 A.2d at 146. The court held that a program had to be evaluated as a whole, including the various categories of individuals for whom the testing was proposed and the full spectrum of tests proposed. *Id.* The Court was not persuaded that the "ordinary" nature of the individual tests, nor their general usefulness in detecting the diseases at issue, defeated plaintiff's proof that the prescribed program was different from that normally recommended in the absence of exposure. *Id.* at 147. The Court thus denied defendant's motion for summary judgment, explaining that it was for the trier of fact to determine whether plaintiffs have satisfied each element of their medical monitoring claim.

However, this reasoning from *Redland Soccer* is simply inapplicable to the facts of the case now before this Court. When plaintiffs, as a whole advanced this argument initially, it was based on the fact that some of the plaintiffs were entitled to seven different diagnostic tests under their proposed program. If all of the plaintiffs were not barred from prosecuting their claims, the Court would be able to find that plaintiffs' proposed program as a whole is "sufficiently different from that normally recommended in the absence of exposure to support a prima facie claim for medical monitoring and survive a motion for summary judgment." *Id.* However, because five of the six plaintiffs are time-barred from prosecuting their claims, no remaining plaintiff is entitled to any type of diagnostic testing that would not be recommended in the absence of exposure. Thus, because Ms. McNally only seeks medical monitoring for tests that would be recommended to all adults in the absence of exposure, the Court finds that Ms. McNally cannot satisfy the sixth element of *Redland Soccer*. Thus, the Court will enter summary judgment against Ms. McNally and in favor of defendants.

VI. *Conclusion*

Accordingly, for the foregoing reasons, this Court will deny defendants' motion for summary judgment concerning plaintiffs' contributory negligence, assumption of risk and consent to exposure to hazardous substances. The Court will grant in part and deny in part defendants' motion for summary judgment based on the statute of limitations. This motion will be granted to the extent that defendants' seek summary judgment against William Barnes, Catherine Potts, Norma Rodweller, Barbara Salzman and Edward Slivak; the motion will be de-

nied to the extent that defendants seek summary judgment against Ciaran McNally. The Court will grant in part and deny in part defendants' motion for summary judgment concerning plaintiffs' claims for medical monitoring. The motion will be granted to the extent that defendants seek summary judgment against Ciaran McNally, and the motion is denied as moot in all other respects.

An appropriate Order follows.

### ORDER

AND NOW, this 17th day of October, 1997, upon consideration of the following Motions, and any responses thereto, and any replies thereto, it is hereby ORDERED that:

1. Defendants' Motion for Summary Judgment Concerning Plaintiffs' Contributory Negligence, Assumption of Risk and Consent to Exposure to Hazardous Substances is DENIED;

2. Defendants' Motion for Summary Judgment Based on the Statute of Limitations is GRANTED in part and DENIED in part. The Motion is granted to the extent that defendants' seek summary judgment against William Barnes, Catherine Potts, Norma Rodweller, Barbara Salzman and Edward Slivak; the Motion is denied to the extent that defendants seek summary judgment against Ciaran McNally. IT IS FURTHER ORDERED that JUDGMENT is ENTERED against William Barnes, Catherine Potts, Norma Rodweller, Barbara Salzman and Edward Slivak and in favor of defendants; and

3. Defendants' Motion for Summary Judgment Concerning Plaintiffs' Claims for Medical Monitoring is GRANTED in part and DENIED in part. The Motion is granted to the extent that defendants seek summary judgment against Ciaran McNally, and the motion is denied as moot in all other respects. IT IS FURTHER ORDERED that JUDGMENT is ENTERED against Ciaran McNally and in favor of defendants.

AND IT IS SO ORDERED.